**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CHAD and STACIA COLEMAN,

     Plaintiffs,

v.                                      Civ. No.  17-663 GBW/SMV

COUNTY OF LINCOLN, *et al.*,

     Defendants.

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

     This matter comes before the Court on Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment.  *Doc. 24.*  Having reviewed the motion, the attendant briefing (*docs. 33, 35*), and the relevant law, the Court will GRANT Defendants' motion.

**I.    BACKGROUND**

     This case stems from events surrounding a warrantless search of Plaintiffs' residence on February 2, 2016.  *See doc. 3* at 6-8.  During the search, Plaintiff Chad Coleman received a citation for possession of narcotics paraphernalia in violation of N.M. Stat. Ann. § 30-31-25.1.  *Id.* at 8.  He was subsequently criminally prosecuted by the State of New Mexico in the Lincoln County Magistrate Court.  *See doc. 33*, Ex. C.[1] However, the state magistrate granted Mr. Coleman's Motion to Suppress Evidence on August 29, 2016, finding that the search and seizure of Mr. Coleman's property was

---

[1] The case caption for that criminal prosecution is *State v. Coleman*, M-30-MR-2016-00014.

"constitutionally unreasonable and a violation of [Mr. Coleman's] rights under the

Fourth and Fourteenth Amendments to the U.S. Constitution and Art. II., Sec. 10 of the

N.M. Constitution."[2]  *Id*. at 2.

Plaintiffs filed suit in this Court on June 21, 2017.  *Doc. 1*.  Plaintiffs then filed an

Amended Complaint on July 13, 2017 and a Second Amended Complaint on July 27,

2017, alleging federal constitutional and state law claims pursuant to 42 U.S.C. § 1983

and the New Mexico Tort Claims Act ("NMTCA").  *Docs. 3, 6*.  Specifically, in their

Second Amended Complaint, Plaintiffs bring (1) claims against the individual

Defendants Randall Wikoff and John Does I-III for false arrest and detention in

violation of state law under the New Mexico Tort Claims Act ("NMTCA"), (2) claims

against Defendants Sheriff Robert Shepperd and the County of Lincoln for *respondeat*

*superior* liability arising from the NMTCA claims; (3) claims against Defendants Wikoff

and John Does I-III for unconstitutional search and seizure in violation of the Fourth

Amendment under § 1983, (4) claims against Defendants Shepperd and the County of

Lincoln for malicious prosecution and abuse of process in violation of the Fourth and

---

[2] Plaintiffs do not assert collateral estoppel against Defendants' assertion that the warrantless search of Plaintiffs' home and subsequent seizure of drug paraphernalia was constitutional pursuant to the consent exception to the warrant requirement.  However, the Court finds it important to note that it is not bound by the state magistrate court's determination that Defendants' search and seizure violated the Fourth and Fourteenth Amendments.  Defendants are not collaterally estopped from having issues previously decided in state court reconsidered in federal court, because Defendants were not parties to the state magistrate court case and had no opportunity to litigate the issue of the constitutionality of their search and seizure.  "[O]ne general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979); *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 328-29 (1971)).

Fourteenth Amendments under § 1983,[3] and (5) a supervisory liability claim against Defendants Shepperd and the County of Lincoln, and an official-capacity municipal liability claim against Defendant County of Lincoln, both arising from the § 1983 claims. *Doc. 6* at 9-16.[4]

On October 5, 2017, Defendants filed a Motion for Summary Judgment, which was fully briefed on November 14, 2017. *Docs. 24, 33, 35, 36*. In the motion, Defendants Wikoff and Shepperd seek summary judgment on the basis of qualified immunity. *See doc. 24* at 10-20. Defendant the County of Lincoln further asserts it is entitled to summary judgment on Plaintiffs' malicious prosecution and abuse of process claims on the basis that Defendant Wikoff had probable cause to cite Plaintiff Chad Coleman for possession of drug paraphernalia, and there is no other overt misuse of process alleged. *Id.* at 16-20. Additionally, Defendants Shepperd and the County of Lincoln seek summary judgment on Plaintiffs' supervisory and official-capacity municipal liability claims on the basis that neither type of claim will lie under § 1983 without a showing of

---

[3] By its clear language, the Second Amended Complaint does not bring these claims as state torts but as federal claims pursuant to 42 U.S.C. § 1983. *See doc. 6* at 11-12. As such, this claim against Defendant Shepperd (or any other individual defendant) is subject to the defense of qualified immunity. Nonetheless, Defendants' Motion, due to the lack of clarity in Plaintiffs' briefing, assumes and addresses a possible state claim for abuse of process. *Doc. 24* at 19. In Plaintiffs' Response, they baldly claim that "Defendants are on fair notice Plaintiffs are bring [sic] both state and federal claims." *Doc. 33* at 23. The Court does not agree that it or the Defendants would be on notice of such a state claim based on the text of the Complaint. And, of course, a party cannot amend the claims of their Complaint simply by "notifying" the opposing party in a responsive pleading. *See* Fed. R. Civ. P. 15(a)(2). Still, foreseeing a proper request to amend the complaint a third time, the Court will herein consider whether such an amendment would be futile. *See infra* pp. 37-39.

[4] Plaintiffs also asserted various claims against Lincoln County Sheriff's Office Deputy Brack Raines in their Second Amended Complaint, but the parties stipulated to his dismissal prior to the completion of briefing on the present summary judgment motion. *See docs. 29, 31*.

a constitutional violation in the first instance, and that Plaintiffs have failed to show that any constitutional violation occurred. *Id.* at 21-22. Alternatively, Defendants Shepperd and the County of Lincoln argue that even if a constitutional violation has been shown, Plaintiffs failed to establish that any "policy or custom" promulgated by the County or by Sheriff Shepherd was the moving force behind such violation, as would be necessary to prevail on these claims. *Id.* at 22-23.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

Notably, however, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts

qualified immunity at summary judgment, the burden shifts to the plaintiff to show

that: (1) the defendant violated a constitutional right and (2) the constitutional right was

clearly established." *Id.* (*citing Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)). This is a

"strict two-part test" that must be met before the defendant asserting qualified

immunity again "bear[s] the traditional burden of the movant for summary judgment—

showing that there are no genuine issues of material fact and that he or she is entitled to

judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).

The Court may address the two prongs of the test in any order. *Pearson*, 555 U.S. at 236.

"Qualified immunity is applicable unless the official's conduct violated a clearly

established constitutional right." *Pearson*, 555 U.S. at 232 (*citing Anderson v. Creighton*,

483 U.S. 635, 640 (1987)). "A Government official's conduct violates clearly established

law when, at the time of the challenged conduct, '[t]he contours of [a] right [are]

sufficiently clear' that every 'reasonable official would have understood that what he is

doing violates that right.' We do not require a case directly on point, but existing

precedent must have placed the statutory or constitutional question beyond debate."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson*, 483 U.S. at 640 and citing

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Ordinarily, in order for the law to be clearly

established, there must be a Supreme Court or Tenth Circuit decision on point, or the

clearly established weight of authority from other courts must have found the law to be

as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quotation omitted).

In determining whether the plaintiff has met its burden, the Court still construes the facts in the light most favorable to the plaintiff as the non-moving party. *Scott v. Harris*, 550 U.S. 372 (2007); *see Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) ("The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); *Riggins*, 572 F.3d at 1107 (noting that generally the Court "accept[s] the facts as the plaintiff alleges them"). However, at the summary judgment stage, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

Whether resolving an "ordinary" summary judgment motion or one asserting qualified immunity, the Court decides the motion on the basis of the facts in the light most favorable to the non-moving party and must keep in mind three principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal

citation omitted).  Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999).  Third, the court cannot decide any issues of credibility.  *See Liberty Lobby*, 477 U.S. at 255.  "[T]o survive the . . . motion, [the nonmovant] need only present evidence from which a jury might return a verdict in his favor."  *Id.* at 257.

## III.  UNDISPUTED FACTS

The Local Rules regarding summary judgment motions require the non-movant's Response to "contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist."  Additionally:

> Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.  The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).[5]

---

[5] Plaintiffs failed to precisely adhere to this Rule.  Specifically, Plaintiffs attached to their responses an "Affidavit of Chad Coleman," an "Affidavit of Stacia Coleman," and Plaintiffs' Order Granting Suppression in their state criminal case.  *See doc. 33*, Exs. A, B, & C.  However, in citing to these affidavits in their Response, Plaintiffs failed to provide citations to the specific paragraphs on which they were relying and thus did not "refer with particularity to those portions of the record upon which the non-movant relies."  Plaintiffs recognized this oversight and filed a Motion to Amend their Response in order to address these deficiencies, which Defendants opposed.  *Docs. 38, 39*.  However, the Court is willing to

Based on the facts presented by the movants and other facts gleaned from the record, the Court finds the following facts to be undisputed for the purposes of Defendants' motion:

1. On February 1, 2016, a service technician employed by Walker A/C & Refrigeration responded to a service call at Plaintiffs' residence ("the Coleman residence") at 100 Alto Alps in Alto, New Mexico, to work on Plaintiffs' malfunctioning central heating system.  The technician worked on the system until approximately 10:00 p.m. that day.  *Doc. 33* at 11; *doc. 35* at 4.

2. The heating system at the Coleman residence is located in the basement, which can be reached via a stairwell from the living room.  *Doc. 33* at 11; *doc. 35* at 4; *doc. 24*, Ex. C, at 5:00-5:30.

3. Plaintiffs assert that to their knowledge, the service technician remained only in the basement during the service call and did not enter any other part of the Coleman residence.  *Doc. 33*, Ex. A, ¶ 6; *id.*, Ex. B, ¶¶ 5-6.

4. On the same day as the service call at the Coleman residence, February 1, 2016, Lincoln County Sheriff Robert Shepperd received a phone call from Shane Walker, the owner of Walker A/C & Refrigeration regarding the

---

excuse Plaintiff's initial failure and determine which paragraphs of the affidavits Plaintiffs intended to cite in their Response.  The proposed amendment is thus inessential to the Court's determination of Defendants' summary judgment motion, and the Court therefore finds Plaintiffs' Motion moot.

technician's reported observations during the service call.  *Doc. 35* at 1-2, 4; *Doc. 24*, Ex. 1, ¶¶ 4-5.

5.  Defendants assert that Mr. Walker told Sheriff Shepperd that there were several firearms at the Coleman residence, and he was concerned that a young child had access to them.  *Id*. at ¶ 6.

6.  On February 2, 2016, Sheriff Shepperd directed Deputy Randall Wikoff to perform a welfare check at the Coleman residence.  *Id.* at ¶ 7; *doc. 24*, Ex. 2, ¶ 4.

7.  The White Mountain Narcotics Enforcement Unit ("NEU"), including Ruidoso Police Department Officer Wallace Downs and United States Customs and Border Protection Officer Chris Baca, assisted Deputy Wikoff and Deputy Robert Odom during the welfare check.  *Id.* at ¶ 11; *doc. 24*, Ex. 2, ¶ 6.

8.  The team arrived at approximately 9:30 a.m., and knocked numerous times over the span of several minutes.  *Doc. 24*, Ex. 3 (Deputy Odom's lapel video footage) at 0:00-5:00.

9.  The team wore bulletproof vests and side arms.  *Id.* at 1:45-2:00.

10.  Plaintiff Chad Coleman ("Mr. Coleman") answered the side door.  Deputy Odom introduced himself, and said he needed to speak with Mr. Coleman and check on the children in the house.  *Id.* at 4:20-5:00.

11. Deputy Odom asked whether anyone else was home, and Mr. Coleman responded that his wife and daughter were upstairs. *Id.* at 5:05-5:30.

12. Mr. Coleman invited the officers to come upstairs and explained that he had been sleeping downstairs. Deputy Odom followed Mr. Coleman up the staircase, while the other officers met them around out front. Mr. Coleman stated that he would let Deputy Odom's "buddies" into the house, and then did so. *Id.* at 5:00-9:00.

13. On the second entry-level floor of Plaintiffs' split-level home, Plaintiff Stacia Coleman ("Mrs. Coleman") and her daughter appeared. Neither individual was injured or in apparent distress. *Id.* at 5:50.

14. An officer told Mrs. Coleman that they were conducting a welfare check to ensure the safety of Plaintiffs' child. *Id*. at 4:30-6:06.

15. Deputy Odom asked Mr. and Mrs. Coleman for their identification and then followed Mrs. Coleman into a bedroom where she collected her identification and presented it to Deputy Odom. Simultaneously, Deputy Wikoff spoke to Mr. Coleman in the living room. *Id.* at 6:25-7:30.

16. Mrs. Coleman asked Deputy Odom whether everything was okay, and he explained that there was a report regarding a child's access to firearms in the home. *Id*. at 9:15-10:00.

17. Mrs. Coleman replied that there were firearms in the home in a gun safe, but that Deputy Odom would have to ask Mr. Coleman about them. *Id.* at 9:20-9:30.

18. Several officers restated to Mr. Coleman that they have visited to make sure that everything within the Coleman home is safe for Plaintiffs' child. *Id.* at 7:40-7:55. One NEU officer saied, "We appreciate you cooperating, man." *Id.* at 7:50-7:56.

19. Another officer asked, "It ok if we look back here [referring to the back rooms of the house, including the bedroom and bathroom]?" *Id.* at 8:08-8:13. Mr. Coleman responded, "yeah," but warned the officers to "watch [their] step" due to the mess. *Id.* at 8:10-8:25. Mr. Coleman gestured to where the bathroom and bedroom were located, and the officers began to enter the rooms. *Id.*

20. An NEU officer spoke to Mr. Coleman about firearms on the bathroom floor and counter, and expressed concern for the safety of Plaintiffs' child. Mr. Coleman said the family never goes in there and that his daughter stays in her room or the living room. *Id.* at 11:35-12:20.

21. The officer explained that firearms should not be anywhere accessible to his child, and that the current situation posed a serious child safety issue. *Id.* at 11:55-12:15.

22. The officer asked Mr. Coleman whether he had drugs, other than the marijuana the officers had already discovered, in the ashtray. Mr. Coleman said the only marijuana he had was what was remaining in the ashtray, and denied the presence of other drugs. *Id.* at 12:30-13:05; *doc. 24*, Ex. 2, Attachment 1.

23. Deputy Wikoff announced that both guns in the bathroom were chambered with the safeties disengaged, and asked Mr. Coleman to put them in the gun safe. *Doc. 24*, Ex. 3, 13:35-13:40.

24. An NEU officer noted that that he would like to take a look around, because there were bullets and firearms everywhere. *Id.* at 13:45. Mr. Coleman responded, "Sure, sure." *Id*. at 13:48-13:52.

25. An NEU officer asked about a gun lying on the kitchen counter, inquired whether there were any other guns in another bag, and requested permission to search the bag. Mr. Coleman agreed, and the officer inspected the bag. *Id.* at 14:30-15:10.

26. From inside the bag, the officer pulled out a small neoprene container, and asked what was inside. Mr. Coleman told the officer that he was "welcome" to look inside. *Id.* at 14:40-15:10.

27. Mr. Coleman estimated that he owned around 10 or 11 firearms. *Id.* at 15:15-15:20.

28. Deputy Odom explained that they were performing a welfare check, and they found loaded and chambered guns easily within the reach of a child and were concerned for her safety. *Id.* at 19:00-19:15.

29. Deputy Odom stated that he was not personally concerned about Mr. Coleman's marijuana possession, but that he needed to know what else was in the house. He stated that he would like to get the Colemans' permission to search the home to ensure the absence of felony drugs, or, for example, any needles underneath the couch that might harm the child. *Id.* at 19:25-19:40.

30. Deputy Odom confirmed that both Mr. and Mrs. Coleman lived in the home, and asked whether they had any problem with the search. Both Mr. and Mrs. Coleman affirmed they had no problem, and agreed to the search. *Id.* at 19:25-19:45.

31. Deputy Odom also provided that he wanted to make sure that no one was hiding inside any closets, and that he intended to take some photos and leave, so long as the firearms were locked up. *Id.* at 20:10-20:40.

32. The team ran a background check on Mr. Coleman, asked him if he was on probation or parole, whether he had any tattoos, and whether he had ever lived in the state of Missouri. *Id.* at 24:12.

33. Deputy Odom completed a consent search form and explained to Mr. and Mrs. Coleman that, by agreeing and signing the form, Plaintiffs would

authorize the officers to search the house without a warrant.  Mr. and Mrs.

Coleman responded that they were fine with a search, which they considered

to be "no big deal," and reviewed and signed the form.  *Id.* at 20:50-27:00; *doc.*

*24*, Ex. 5.

34. An officer asked Mr. Coleman where other firearms were located.  Mr.

Coleman responded that one firearm was located downstairs.  The officer also

informed Mr. Coleman that he had found a "sub-gun" with a loaded

chamber.  The officer said he could call the district attorney, but saw no

reason to further pursue anything.  He also noted that the presence of the

unsecured guns constituted child endangerment.  *Doc. 24*, Ex. 3, at 21:30-22:00

31:15-32:40; *see also* Ex. 2, Attachment 1.

35. The NEU officer requested the location of the gun safe and asked Mr.

Coleman if he would show it to him.  Mr. Coleman agreed, and walked him

and Deputy Odom into another room.  Mr. Coleman opened the safe and left

the room, telling the officers that he wanted to "get out of [their] hair."  *Doc.*

*24*, Ex. 3, at 32:30-33:20.

36. Deputy Wikoff explained that, because of the guns, they would be making a

report to the Children, Youth and Families Department to make sure there

were not any weapons lying out and to assure that the house, in the future,

would be in less disarray so that the mess could not hide dangerous items. *Id.* at 33:40-34:10.

37. The NEU officer asked Mr. Coleman whether a pipe found in the home belonged to him. Mr. Coleman confirmed that it was. *Id.* at 43:10-44:15; *see also doc. 24*, Ex. 2, Attachment 1.

38. The NEU officer asked to search a box, and Mr. Coleman responded that he was "more than welcome" to open it. Mr. Coleman additionally provided the officer instructions on how to open the box. *Doc. 24*, Ex. 3, at 44:10-44:35.

39. Deputy Wikoff said that the officers were in the process of checking to assure that the guns were not stolen, but that they would be leaving soon. The officers determined that the guns were lawfully owned by Mr. Coleman. *Id.* at 49:20-49:35.

40. Deputy Wikoff cited Mr. Coleman for possession of drug paraphernalia in violation of N.M.S.A. § 30-31-25.1(A). Mr. Coleman signed the citation. *Doc. 24*, Ex. 4, at 37:45-38:00; Ex. 6.

41. The officers left the house around 11:15 a.m. The officers had been inside the Coleman residence for approximately one and one half hours. *Doc. 24*, Ex. 4, at 42:00.

42. A Lincoln County Magistrate Court hearing on a motion to suppress the evidence seized by Defendants from Plaintiffs' home in the criminal

proceedings related to the drug paraphernalia possession charge against Mr.

Coleman was held on July 26, 2016.  *Doc. 33*, Ex. C.

43. During the hearing, Deputy Wikoff testified that he had been told by Sheriff

Shepperd that the individual who called Sheriff Shepperd regarding the

Coleman residence on February 1, 2016 reported a loud argument and a

crying baby during the late-night hours, and that it was this citizen complaint

that precipitated the welfare check at the residence.  *Id.*; *see also doc. 33*, Ex. A

at 2-4; *doc. 35* at 4.

44. On October 4, 2017, the Lincoln County Magistrate Court dismissed the

citation for possession of drug paraphernalia against Mr. Coleman.  *Doc. 33*,

Ex. C.

## IV.    ANALYSIS

### A. Plaintiffs Have Not Made the Requisite Showing for the Court to Defer Ruling on Defendants' Entire Summary Judgment Motion.

As a preliminary matter, the Court notes that Plaintiffs requested in their

Response to Defendants' summary judgment motion that the Court defer rendering

complete judgment on the motion until further discovery is conducted.  *Doc. 33* at 23-24.

Discovery was stayed in this matter pending resolution of the present motion because

Defendants Wikoff and Shepperd invoked the defense of qualified immunity.  *See doc.*

*27* (citing *Workman v. Jordan*, 958 F.2d 332, 336 (10th Cir. 1992)).  When a public official is

entitled to qualified immunity, the entitlement relieves the official from bearing any of

the burdens of litigation, including discovery. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).

However, Plaintiffs argue that, because Defendants' Unopposed Motion to Stay

Discovery on the Basis of Qualified Immunity (*doc. 26*) "was limited to qualified

immunity[,] Plaintiffs have had no opportunity to conduct any discovery to establish

material facts in dispute to defend a substantive motion for summary judgment." *Doc.

33* at 23. Thus, they ask the Court to "strike or refuse to consider any summary

judgment motion other than qualified immunity." *Id.* The claims on which Defendants

seek summary judgment that are not based on the qualified immunity defense include

(1) Plaintiffs' NMTCA false arrest and detention claims against the Defendant officers,

(2) Plaintiffs' § 1983 malicious prosecution and abuse of process claims against

Defendant County of Lincoln, and (3) Plaintiffs' § 1983 supervisory and municipal

liability claims against Defendants Shepperd and the County of Lincoln.

Fed. R. Civ. P. 56(d) allows the Court to defer consideration of a summary

judgment motion or allow time for discovery, if "a nonmovant shows by affidavit or

declaration that, for specified reasons, it cannot present facts essential to justify its

opposition[.]" Fed. R. Civ. P. 56(d). The Tenth Circuit has construed this provision to

require a declaration from the non-moving party specifying (1) the probable facts that

are not available, (2) why those facts cannot be presented currently, (3) what steps have

been taken to obtain these facts, and (4) how additional time will enable the party to

obtain those facts and rebut the motion for summary judgment. *Birch v. Polaris Indus.*,

*Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015). Plaintiffs have not provided any such affidavit or declaration, nor have they made this showing in their briefing. In fact, the only reference in their briefing to specific further discovery they desire to aid in their opposition to the present motion is as follows:

> Plaintiffs [credibly] believe further discovery including Defendant Wikoff's deposition will establish his affidavit was deliberately misleading in omitting his prior sworn testimony and that testimony specifically contradicted Sheriff Shepperd's sworn affidavit. Plaintiffs further [credibly] believe discovery of the business records and deposition of Shane Walker will establish Shane Walker was not at the Coleman home on February 1, 2016 and could not have seen a cache of weapons in their home on that date.

*Doc. 33* at 19.

Specifically, Plaintiffs contend that Defendant Wikoff's prior sworn testimony contradicts Defendant Shepperd's affidavit (*doc. 24*, Ex. 1), because Defendant Wikoff testified during the suppression hearing in the Lincoln County Magistrate Court that the officers were dispatched to the Coleman residence based on a report of a loud argument and crying baby at the residence the night before, rather than a report of firearms accessible to a young child. *Doc. 33* at 17. In contrast, Defendant Shepperd swears in his affidavit that he directed that the welfare check be performed at the Coleman residence pursuant to a phone call from Shane Walker reporting a domestic altercation as well as Mr. Walker's personal observation of numerous firearms inside the residence, which caused him to be concerned for the safety of the Colemans' child. *Doc. 24*, Ex. 1.

Plaintiffs argue that, if the service technician at their home on February 1, 2016 was not Shane Walker but was instead one of Mr. Walker's employees, and there was also no report made to Defendant Shepperd of firearms accessible to their child, the search of the Coleman residence was thus based on a "police created exigency." *Doc. 33* at 18. They further assert that Defendant Wikoff's prior testimony that the welfare check was precipitated by a report of a crying baby and argument, rather than a report of firearms, "established the absence of an exigent circumstance which would justify going into Plaintiffs' home in the first instance." *Id*.

However, Defendants do not argue that exigent circumstances justified their entry into the Coleman residence. Rather, their summary judgment motion as to Plaintiffs' NMTCA claims and unconstitutional search and seizure claims relies on the fact that Plaintiffs consented to their entry and subsequent search of Plaintiffs' home. *See doc. 24* at 10-16. Therefore, the further discovery Plaintiffs seek would not be material to resolution of the present motion.

In other words, even if Plaintiffs could obtain facts establishing that Defendant Wikoff's prior testimony contradicts Defendant Shepperd's affidavit, and that Shane Walker was not present at the Coleman residence on February 1, 2016, they have failed to show how such facts would assist in rebutting Defendants' argument that Plaintiffs consented to the entry into and search of their residence. Such facts are immaterial, because the determination of the summary judgment motion before the Court depends

on whether the search of Plaintiffs' home, seizure of drug paraphernalia, and subsequent criminal citation of Mr. Coleman constituted false arrest, false detention, an unreasonable search or seizure, and/or malicious prosecution and abuse of process. That search, seizure, and criminal citation all occurred later in time than Plaintiffs' alleged consent to the officers' entry and search of the residence. Plaintiffs have not brought any claims against the Defendant officers based on actions that took place prior to the officers' entry into their home. *See generally doc. 6.*

Plaintiffs have failed to explain how further discovery could possibly rebut Defendants' assertion—supported by video footage of the entire encounter—that Plaintiffs consented to the entry or the search of their home by the Defendant officers. If they did so consent, all of their NMTCA claims against the Defendant officers would be defeated. "When a person voluntarily consents to a search, it is lawful regardless of whether the officer had constitutional justification to conduct an unwarranted search." *State v. Olson*, 285 P.3d 1066, 1071 (N.M. 2012). Whether the welfare check was initiated without probable cause or reasonable suspicion in the first instance is thus immaterial to whether the actual search, seizure, and prosecution underlying Plaintiffs' claims violated any state law or the Constitution. Therefore, Plaintiffs have not met either the procedural or substantive Rule 56(d) prerequisites for deferring consideration of the present motion.

Additionally, as to their § 1983 malicious prosecution and abuse of process claim

against Defendant County of Lincoln, and the supervisory and municipal liability claims against Defendants Shepperd and the County of Lincoln, Plaintiffs do not oppose the Court engaging in the requisite analysis to decide whether the Defendant officers are entitled to qualified immunity. One prong of that qualified immunity analysis will involve considering whether the Defendant officers violated any of Plaintiffs' constitutional rights generally in the course of their search of the home, seizure of drug paraphernalia, and issuance of the possession citation to Mr. Coleman. *Martinez*, 563 F.3d at 1088.

For the reasons explained in greater detail below, the Court ultimately concludes that no constitutional violation occurred. Given that conclusion, no amount of additional discovery could salvage Plaintiffs' malicious prosecution, abuse of process, supervisory or municipal liability claims. As such, the Court denies Plaintiffs' request to defer ruling on the entirety of Defendants' summary judgment motion pending further discovery.

**B. Defendant Wikoff is Entitled to Summary Judgment on Plaintiffs' NMTCA False Arrest and Detention Claim.**

Count I of Plaintiffs' Second Amended Complaint alleges that Defendant Wikoff wrongfully detained Plaintiffs within their home without probable cause or a warrant, in violation of N.M. Const. Art. II § 10, which prohibits law enforcement from detaining

individuals without a warrant, absent certain exceptions.[6]  Specifically, Plaintiffs

contend that Defendant Wikoff "illegally detained [the] Colemans [such that they] were

not free to leave and [were] actively or constructively arrested." *Doc. 6* at 9.  Plaintiffs

assert that this count is properly brought against Defendant Wikoff, because the

NMTCA provides that sovereign immunity does not apply to protect against claims of

false imprisonment or false arrest when caused by law enforcement officers acting

within the scope of their duties.  N.M.S.A. § 41-4-12.  Defendant Wikoff argues that he is

entitled to summary judgment on Plaintiffs' NMTCA claims because Plaintiffs

consented to his entry into and search of their residence, and were never arrested or

detained at all.  *Doc. 24* at 10-13.

Under New Mexico law, "[f]alse imprisonment consists of intentionally *confining*

*or restraining* another person without his *consent* and with knowledge that he has no

lawful authority to do so."  *State v. Muise*, 707 P.2d 1192, 1198 (N.M. Ct. App. 1985)

(quoting N.M.S.A. § 30-4-3) (emphasis added).  Plaintiffs fail to establish at least two of

these elements.

First, there is no evidence that Plaintiffs were confined or restrained by

Defendants.  Defendant Wikoff and his fellow officers never arrested or formally

---

[6] Plaintiffs simultaneously bring claims against John Does I-III, presumably Deputy Odom and White Mountain Narcotics Officers Downs and Baca, in all counts asserted against Defendant Wikoff. *Doc. 6* at 9-10.  These individuals have yet to be named or served by Plaintiffs.  However, throughout this opinion, any analysis that applies to Defendant Wikoff applies equally to John Does I-III, unless stated otherwise.

detained either Mr. Coleman or Mrs. Coleman.  Nor did they otherwise indicate that the Colemans were not free to leave.

Second, even if Plaintiffs could establish an implicit command by the officers that prevented them from leaving and assuming such an implicit command would be sufficient for this tort, Plaintiffs consented to the entire encounter.  The extent and scope of consent is evaluated according to an objective reasonableness standard, based on the totality of the circumstances.  *State v. Garcia*, 986 P.2d 491, 493 (N.M. Ct. App. 1999).  Specifically, voluntariness is determined based on:

> the individual characteristics of the defendant, the circumstances of the detention, and the manner in which the police requested consent.  The voluntariness of consent involves a three-tiered analysis: (1) there must be clear and positive testimony that the consent was specific and unequivocal; (2) the consent must be given without duress or coercion; and (3) the first two factors are to be viewed in light of the presumption that disfavors the waiver of constitutional rights. . . .  Ultimately, the essential inquiry is whether [the] [d]efendant's will had been overborne.

*State v. Flores*, 185 P.3d 1067, 1070 (N.M. Ct. App. 2008) (quoting *State v. Pierce*, 77 P.3d 292, 298 (N.M. Ct. App. 2003)).

In the case at bar, the undisputed material facts establish that Plaintiffs consented, specifically and unequivocally to their interaction with the officers within their home.  Throughout the interaction, the officers engaged Plaintiffs in friendly conversation, and the Plaintiffs sat comfortably in the living room, occasionally moving about to help the officers. In fact, Plaintiffs' daughter felt so comfortable in the situation

that she freely wandered around, befriended Deputy Odom, and offered him one of her toys to play with. *Doc. 24*, Exhibit 3 at 9:00-11:00.

Never during the entire encounter did Plaintiffs express discomfort with or opposition to the officers' presence in their home, nor did they ask the officers whether they, the Plaintiffs, were free to leave. Even looking to these facts in the light most favorable to Plaintiffs, no reasonable jury could conclude that the Plaintiffs did not consent, specifically and unequivocally to their interaction with the officers within their home. 185 P.3d at 1070.

As to the second *Flores* tier, Plaintiffs do not present any facts which would indicate any coercion or duress on the part of Deputy Wikoff or the other officers that would nullify the voluntariness of Plaintiffs consent. Although the officers wore bulletproof vests and possessed side-arms, they spoke in respectful and friendly tones, and performed no acts that would cause a reasonable person to feel they were required to remain in place. Plaintiffs contend that they only cooperated with the officers because they feared that Child Protective Services would take away their daughter if they did not do so. However, such private and unexpressed fears of Plaintiffs do not establish "duress or coercion" under the applicable test, even viewing that factor "in light of the presumption that disfavors waiver of constitutional rights." *Flores*, 185 P.3d at 1070.

Deputy Wikoff and his fellow officers made no threats to incite or aggravate Plaintiffs' unexpressed fear.  Rather, the officers reasonably performed their duty by counseling Plaintiffs that the loaded and unguarded firearms strewn throughout the home presented a danger to their child, and as such, the firearms should be stowed properly.  While the Defendant officers noted that Child Protective Services would be performing a check in the future to ensure that the conditions in Plaintiffs' home remained safe for children, no one stated or even insinuated that Plaintiffs would suffer any adverse consequences if they did not remain where they were.  Thus, viewing the facts in the light most favorable to Plaintiffs, the undisputed material facts show that Deputy Wikoff and his fellow officers engaged in no acts of coercion that would nullify Plaintiffs' clear, voluntary, and continuing consent to their interaction with the officers within their home.

Because Plaintiffs were not restrained and the entire encounter was consensual, no false arrest or false detention occurred.  *Muise*, 707 P.2d at 1198.  As such, Defendant Wikoff is entitled to summary judgment on this claim.

### C.  Defendant Wikoff is Entitled to Qualified Immunity on Plaintiffs' Illegal Search & Seizure Claims.

Count II of Plaintiffs' Second Amended Complaint alleges that Defendant Wikoff violated Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures in their home and their Fourteenth Amendment right to be free of any deprivation of their liberty without due process.  *Doc. 6* at 10-11.  Because Plaintiffs'

Fourteenth Amendment claim is improper in the context of a law enforcement search or seizure, the Court only addresses Plaintiffs' claims under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [excessive force] claims."); *Shimomura v. Carlson*, 811 F.3d 349, 361-62 (10th Cir. 2015) (applying the *Graham* rule in the context of a false arrest claim, and explaining that a claim "confined . . . to the deprivation of physical liberty . . . is governed by the Fourth Amendment rather than the Due Process Clauses") (quoting *Becker v. Kroll*, 494 F.3d 904, 920 (10th Cir. 2007)).

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Payton v. New York*, 445 U.S. 573 (1980); *Johnson v. United States*, 333 U.S. 10 (1948)). However, this prohibition does not apply when voluntary consent has been obtained from the individual whose property is searched or from a party who possesses common authority over the premises. *Id*. Whether consent to a search was voluntary "is a question of fact to be determined from the totality of all the circumstances." *United States v. Sims*, 428 F.3d 945, 952 (10th Cir. 2005) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

A defendant "establishes voluntariness only if [the defendant] (1) produces clear

and positive testimony that the consent was unequivocal, specific, and freely given, and (2) proves that consent was given without duress or coercion, express or implied." *Id.* (citing *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992)). "[A] court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances." *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998) (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994)).

As discussed above, Plaintiffs bear the burden to overcome Defendant Wikoff's assertion of qualified immunity by meeting the "strict two-part test" which requires a showing that (1) Defendant Wikoff violated Plaintiffs' constitutional rights, and (2) those constitutional rights were clearly established. *Clark*, 513 F.3d at 1222; *Martinez*, 563 F.3d at 1088. For the following reasons, Plaintiffs have failed to meet their burden as to the first prong, and Defendant Wikoff is thus entitled to qualified immunity.

Overall, the lapel camera footage clearly indicates that Plaintiffs voluntarily consented to Defendant Wikoff's entry into and search of their residence. Specifically, Mr. Coleman unambiguously invited Deputy Odom into his home, and similarly made the intentional decision to let Deputy Odom's "buddies" in through a separate door. *Doc. 24*, Ex. 3, at 6:00-8:00. The officers repeatedly asked for additional and continuing permission from Plaintiffs to perform searches of different bags, rooms, and objects,

which Plaintiffs gave, throughout.  The officers also secured Plaintiffs' written consent,[7]

notwithstanding Plaintiffs' assurances that they freely consented to continued

searching, and that a consent form would not be necessary.  *Id.* at 19:00-25:00; *see United*

*States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007) ("To satisfy the first prong of the

voluntariness requirement, a defendant's consent must be clear, but it need not be

verbal.  Consent may instead be granted through gestures or other indications of

acquiescence, so long as they are sufficiently comprehensible to a reasonable officer.").

At no point during the encounter did either Plaintiff object to or seek to end the

encounter.  Rather, the officers praised Plaintiffs' cooperativeness, and Mr. Coleman

amenably responded, "Tell me what you need from me."  *Id.* at 13:00-13:30.  Mrs.

Coleman also thanked the officers for the visit, noting their concern "makes me feel

---

[7] Mr. Coleman's signed consent form reads:

> I, Chad Coleman hereby grant my consent to Officer Deputy Wikoff of the Lincoln County Sheriff's Department or other law enforcement agency to search the following vehicle described below, including all luggage, containers, and contents of all 100 Alto Alps, Alto, NM 88312-Residence.  I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above to sign this form. *Doc. 24*, Ex. 5.

Plaintiffs argue that this consent form did not effectively secure their consent to the search of their residence, because the form refers specifically to the search a "vehicle." *Doc. 33*, Ex.1 at 2,¶ 13. However, the form later describes that consent applies to a search "of all 100 Alto Alps, Alto NM 88312-Residence." Further, Deputy Odom explained to Plaintiffs, prior to Plaintiffs' decision to sign the form that, although the consent form referred to vehicle searches, specifically, it nevertheless applied in this circumstance to the search of Plaintiffs' home. *Doc. 24*, Ex. 3, 20:50-27:00. Therefore, Plaintiffs' attempt to nullify the effectiveness of the consent form fails.  Moreover, even if the consent form was considered a nullity, it would not change the fact that Plaintiffs consented verbally and with their actions to the entry into and search of their home. *See, e.g., United States v. Drayton*, 536 U.S. 194 (2002) (no constitutional requirement to have consent in writing or inform citizen of right to refuse consent)

safe." *Id.* at 10:53.  Further, neither Deputy Wikoff nor any other member of the team threatened, coerced or otherwise demonstrated any signs of forcefulness to elicit the Colemans' cooperation.  Rather, the officers behaved in a friendly and polite manner.

Nevertheless, Plaintiffs claim that Deputy Wikoff and his fellow officers used force by wearing "tactical gear." *Doc. 33* at 21.  Although it is true that the officers wore bulletproof vests and side-arms, this is insufficient to constitute use of or threat of use of force. *See Pena-Sarabia*, 297 F.3d at 987 (officers' mere possession of weapons did not nullify the voluntariness of consent where the officers did not draw or display their weapons).

 Plaintiffs further assert that Defendant Wikoff and his fellow officers obtained consent by means of trickery, because Sheriff Shepperd had told Defendant Wikoff, prior to his arrival at the Colemans home, "to do whatever necessary to gain entry." *Doc.* 33 at 21.  However, Defendant Wikoff did not reveal this information to Plaintiffs during the encounter or as a means to gain entry.  Rather, Plaintiffs discovered this information long after the search took place, from Defendant Wikoff's testimony given during the suppression hearing before the Lincoln County Magistrate Court. *Id.* at 22. Ultimately, regardless of whether these orders existed, the officers did *not* engage in extraordinary or unconstitutional means to enter the home.  Rather, they explained to Mr. Coleman that they wished to check on the welfare of his daughter, and Mr. Coleman, without hesitation, immediately invited them inside.  The Court finds no

evidence of deception, trickery or threat that would nullify the voluntariness of Plaintiffs' consent, even viewing the facts in the light most favorable to Plaintiffs.

Plaintiffs additionally make two additional claims: that Defendant Wikoff and the other officers falsified a police report and that Defendant Wikoff wrongfully arrested Mr. Coleman for "Possession of Narcotics Paraphernalia [pursuant to N.M.S.A.] 30-31-25.1." *Doc. 6* at 10-11. First, Plaintiffs provide no evidence to support or even an explanation of their bald allegation of a falsified police report. Second Defendant Wikoff did not arrest Mr. Coleman for possession of drug paraphernalia; he merely issued a citation for the offense, which required Mr. Coleman to appear in court the following month. *Doc. 24*, Ex. 6. Moreover, even if Deputy Wikoff had arrested Mr. Coleman for the offense, such an arrest would not have violated the Fourth Amendment because a warrantless arrest is reasonable "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Whether such probable cause exists "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.*

It is undisputed that Mr. Coleman claimed ownership of the marijuana pipe that the Defendant officers found during the search of his home. *Doc. 24*, Ex. 3 at 43:10-44:15. And, as just discussed, the search itself was consensual and thus constitutional.

The Court is therefore unable to determine any factual basis in the evidence of record for Plaintiffs' contentions regarding a falsified police report or wrongful arrest.

Consequently, because Plaintiffs voluntarily consented to the encounter, and a reasonable officer could properly rely on such consent, Plaintiffs have failed to overcome Defendant Wikoff's qualified immunity defense by showing that Defendant Wikoff committed a constitutional violation, let alone a constitutional violation under clearly established law. Overall, Plaintiffs' implicit claim of an underlying conspiracy on the part of Defendants is irrelevant, because Plaintiffs *voluntarily* consented to the encounter in the absence of deception or trickery. Plaintiffs' additional assertion that there was no probable cause or exigency justifying the officers' entry into the home is similarly irrelevant. Because Plaintiffs unambiguously consented throughout, the Court need not consider hypotheticals concerning whether the officers would have had the right to enter the home and conduct a search in the absence of consent.

Therefore, Defendant Wikoff is entitled to qualified immunity. Accordingly, all claims against Defendant Wikoff are hereby dismissed with prejudice.[8]

---

[8] Dismissal of these claims on the basis of qualified immunity applies equally to John Does I-III.

**D. Defendants Shepperd and County of Lincoln Are Entitled to Summary Judgment on Plaintiffs' Malicious Prosecution and Abuse of Process Claims.**

*i.*     *Malicious Prosecution Under § 1983*

Count III of Plaintiffs' Second Amended Complaint alleges that Defendant Shepperd and the County of Lincoln violated Plaintiffs' Fourth and Fourteenth Amendment rights to be free from criminal prosecution initiated without probable cause. A cause of action under § 1983 for malicious prosecution is recognized in the Tenth Circuit. To prevail on a § 1983 malicious-prosecution claim, "a plaintiff must show: (1) the defendant caused the plaintiff's confinement or prosecution; (2) the original action terminated in the plaintiff's favor; (3) there was no probable cause to confine or prosecute the plaintiff; (4) malice; and (5) damages." *Cordova v. City of Albuquerque*, 816 F.3d 645, 650 (10th Cir. 2016) (quoting *Wilkins v. DeReyes,* 528 F.3d 790, 799 (10th Cir. 2008).

The first prong requires Plaintiffs to prove that Mr. Coleman was arrested or incarcerated in the traditional sense. *Becker*, 494 F.3d at 914-15 (rejecting the plaintiff's attempt to extend Fourth Amendment liability to cases where the plaintiff is not *physically* arrested or incarcerated). Second, the third prong requires Plaintiffs to "prove that [Defendants] initiated or continued a proceeding against [Mr.Coleman] without probable cause." *Nielander v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1164 (10th Cir. 2009) (citing *Becker*, 494 F.3d at 913-14).

Here, Plaintiffs' § 1983 malicious prosecution claim fails. First, Plaintiffs' claim fails under the first prong, because Defendant Wikoff and his fellow officers never physically arrested or incarcerated Mr. Coleman. He was thus never "seized" under the Fourth Amendment. Plaintiffs' contrary argument that Mr. Coleman's citation constituted a constructive arrest that qualifies for Section 1983 relief is directly contradicted by clearly established law in the Tenth Circuit. *Mata v. Anderson*, 635 F.3d 1250, 1254 (10th Cir. 2011); *Neilander*, 582 F.3d at 1164-65; *Becker*, 494 F.3d at 914-15.

Second, Defendant Wikoff had probable cause to cite Mr. Coleman for possession of marijuana paraphernalia pursuant to the officers' plain view of the paraphernalia when legally within Plaintiffs' home pursuant to Plaintiffs' consent, and pursuant to Plaintiffs' additional consent to search. *See United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002) ("An item's incriminating nature is immediately apparent if the officer had probable cause to believe the object was contraband or evidence of a crime." (internal quotations and citation omitted)); *see also Texas v. Brown*, 460 U.S. 730, 738 (1983); *Horton v. California*, 496 U.S. 128, 130 (1990). As such, Mr. Coleman was neither unconstitutionally detained nor prosecuted. Considering the foregoing, Defendants Shepperd and the County of Lincoln are entitled to summary judgment on Plaintiffs' § 1983 malicious prosecution claim.

ii.     *Abuse of Process Under § 1983*

Based on the title of Count III of their Second Amended Complaint ("Malicious

Prosecution / Abuse of Process (42 U.S.C. § 1983, Fourth & Fourteenth Amendments),"

Plaintiffs may be raising a § 1983 claim of Abuse of Process distinct from their § 1983

claim for Malicious Prosecution contending that Defendants maliciously cited Mr.

Coleman for possession of drug paraphernalia.[9]  If so, the distinction would be found in

state tort law as it is the starting point for evaluating such claims brought pursuant to §

1983.  *See Roska v. Peterson*, 328 F.3d 1230, 1244 (10th Cir. 2003); *see also Taylor v.

Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996).

In New Mexico, the torts of malicious prosecution and abuse of process have

been combined "for the sake of simplicity and to avoid confusion."  *Durham v. Guest*,

145 N.M. 694, 701 (2009).  Their combined elements are: "(1) the use of process in a

judicial proceeding that would be improper in the regular prosecution or defense of a

claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate

end; and (3) damages.  An improper use of process may be shown by (1) filing a

complaint without probable cause, or (2) 'an irregularity or impropriety suggesting

extortion, delay, or harassment[,]' or other conduct formerly actionable under the tort of

abuse of process."  *Id*. (quoting *Fleetwood Retail Corp. of N.M. v. Ledoux*, 142 N.M. 150, 154

(2007).

---

[9] Plaintiffs bring this claim against Defendant Shepperd and Defendant County of Lincoln, neither of whom issued the citation to Mr. Coleman.  Even if this claim were brought against the proper party, Defendant Wikoff, the claim would nevertheless fail.

To be sure, the New Mexico tort sweeps much broader than the constitutional tort of malicious prosecution explicated in *Cordova*. It is immediately apparent that the New Mexico tort does not have at least three of the requirements of that constitutional tort. First, there is no need for plaintiff to establish that the defendant caused the plaintiff's confinement or prosecution.[10] Second, the plaintiff need not prove that the action terminated in the plaintiff's favor. *See DeVaney v. Thriftway Mktg. Corp.*, 124 N.M. 512, 521 (1997), overruled in part by *Durham*, 145 N.M. at 701. Third, a plaintiff can prove the New Mexico tort for abuse of process without establishing lack of probable cause by instead showing some irregularity or impropriety suggesting extortion, delay, or harassment.

So, the Court must determine whether committing such a state tort – bringing a criminal charge which does not lead to an arrest and which, while supported by probable cause, was brought with some irregularity or impropriety – would rise to the level of a constitutional violation redressable under § 1983. It would not.

As now-Justice Gorsuch explained in his *Cordova* concurrence, a constitutional tort must find its grounding in the United States Constitution. *Cordova*, 816 F.3d at 661. Plaintiffs here point to both the Fourteenth and Fourth Amendments as the repository for the claimed constitutional tort pled in Count III. Yet those Amendments do not provide a basis for a constitutional tort as broad as New Mexico's state tort.

---

[10] In fact, a plaintiff need not even prove that defendant caused the initiation of the action against the plaintiff. *See Durham v. Guest*, 145 N.M. 694, 701 (2009).

First, "the 'substantive' component of the Fourteenth Amendment's due process clause contains nothing like this tort." *Id*. at 662 (*citing Albright v. Oliver*, 510 U.S. 266, 271-75, 281-83, 286 (1994). Second, the "procedural" component of the Fourteenth Amendment's due process clause cannot be violated here because "state tort law provides adequate remedies to resolve plaintiff's complaint." *Id*. (citations omitted). So, one must turn to the Fourth Amendment to find support for such a constitutional tort.

The relevant language of the Fourth Amendment addresses "unreasonable searches and seizures." As described above, the elements of a constitutional malicious prosecution claim require a physical arrest or incarceration. *Becker*, 494 F.3d at 914-15. In other words, it requires a seizure. The Court concludes that, no matter what else an alternative constitutional abuse of process tort might require, it at least would require a physical arrest or incarceration. As explained above, Plaintiffs were not arrested or otherwise incarcerated on the drug paraphernalia charge.

Moreover, across virtually all contexts, Fourth Amendment case law repeatedly focuses on objective facts rather than the subjective intent of the officers. *See Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) (court cannot consider the arresting officer's underlying dislike of Plaintiff as a motivating factor when determining whether Plaintiff's arrest for a seatbelt violation violated the Fourth Amendment, because the arrest was objectively reasonable); *Brendlin v. California*, 551 U.S. 249, 260 (2007)

(rejecting state court's consideration of the police officers' motive for stopping

Defendant's car, because "[s]ubjective intentions play no role in ordinary, probable

cause Fourth Amendment analysis"); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404

(2006) (Officers' entry into home was reasonable, regardless of whether it was

"primarily motivated by intent to arrest and seize evidence," because "[a]n action is

'reasonable' under the Fourth Amendment, regardless of the individual officer's state of

mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.") (citing *Scott*

*v. United States*, 436 U.S. 128, 138 (1978)); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("As

in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an

excessive force case is an objective one: the question is whether the officers' actions are

"objectively reasonable" in light of the facts and circumstances confronting them,

without regard to their underlying intent or motivation.")

It would be contrary to this well-established principle to permit a constitutional

tort based not on the lack of probable cause but instead on the subjective intent of the

officers.  Consequently, this Court also concludes that, no matter what else an

alternative constitutional abuse of process tort might require, it at least would require

the lack of probable cause.  *See, e.g., Roska*, 328 F.3d at 1425 (accepting without

discussion constitutional claim of abuse of process where underlying state tort required

absence of probable cause).   As explained above, there was ample probable cause to

cite Plaintiffs for possession of drug paraphernalia.

For both these reasons, if Count III contains a claim for a constitutional tort distinct from malicious prosecution, the claim also fails.

     iii.    *An Amendment to Merely Add a State Claim of Abuse of Process Would Be Futile*

In their Response, Plaintiffs indicate that they intended to make a "malicious prosecution claim under state law." *Doc. 33* at 23. Moreover, they indicate that, if the Court concludes that such a claim was not brought, they would seek leave to amend the complaint. *Id*. Importantly, Plaintiffs do not suggest that their amendment would add any additional factual allegations, but would simply make "reference to the state law basis for jurisdiction" in Count III. *Id*. Because the Court concludes that such an amendment would be futile, no purpose would be served by giving Plaintiffs the opportunity to do so. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (futility of amendment justifies denial of leave to amend).

As explained above, the state tort of malicious abuse of process requires a plaintiff to show *inter alia* that (1) a complaint was filed without probable cause, or (2) "'an irregularity or impropriety suggesting extortion, delay, or harassment[,]' or other conduct formerly actionable under the tort of abuse of process." *Durham*, 145 N.M. at 701 (quoting *Fleetwood Retail Corp.*, 142 N.M. at 154). Because the citation for drug paraphernalia was supported by probable cause, plaintiff would be required to demonstrate conduct suggesting extortion, delay, or harassment. The Second Amended Complaint lacks sufficient facts to make such a claim.

The only possible basis Plaintiffs offer to satisfy this element is that "Defendants acted with malice in pursuing this prosecution against Plaintiffs because they did so maliciously knowing that prosecution and a conviction or plea agreement would make it difficult, if not impossible, for Plaintiffs to pursue a civil claim against Defendants for their unconstitutional and illegal acts." *Doc. 6* at 12. Plaintiffs allege no facts to support this allegation, let alone pointing to any facts in the summary judgment record to do so. At a minimum, it would seem Plaintiffs would have to allege (and, at this stage, create a factual issue suggesting) that the officers suspected that, prior to issuing the citation, Plaintiffs were contemplating filing a lawsuit due to the encounter.

Plaintiffs have not done so, and the video of the encounter does not suggest that they could. In fact, the undisputed facts demonstrate that (1) the officers had no reason to suspect that Plaintiffs were upset about the encounter; and (2) if their motive was as Plaintiffs' claim, they could have charged Plaintiffs with the more serious charge of child endangerment and/or arrested Plaintiffs. Plaintiffs completely unsubstantiated claim about the officers' motive would be insufficient to make a plausible claim of state malicious abuse of process. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). Therefore, an amendment to add that claim would be futile.

### E. Defendants are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability and Official Capacity Claims.

In Counts IV and V of their Second Amended Complaint, Plaintiffs bring a § 1983 supervisory liability claim against Defendants Shepperd and County of Lincoln and a § 1983 official-capacity claim against County of Lincoln. Specifically, Plaintiffs contend that Defendant Shepperd breached his duties as a sheriff,

> by failing to adopt proper policies, procedures and protocols, by failing to implement appropriate training, by failing to adequately investigate and discipline the subordinate officer involved in this incident, by failing to conduct mandatory post-incident investigations, and by failing to take other appropriate supervisory actions [which] would have prevented the deprivation of the clearly established constitutional rights of Plaintiffs . . . [and these] acts and omissions . . . were the direct and proximate cause of the injuries and damages suffered by Plaintiffs as set forth herein[.]

 *Doc. 6* at 13-14.

Similarly, Plaintiffs contend that Defendant County of Lincoln's policies or customs were the direct and proximate cause of Plaintiffs' injuries. *Doc. 6* at 15-16.

"A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Similarly, "[a] plaintiff suing a municipality under section 1983 for the acts of

one of its employees must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional violation." *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

Here, Plaintiffs' claims of supervisory or official-capacity liability fail on the first element. For the same reasons discussed above, based on the summary judgment record, no reasonable jury could find that a constitutional violation occurred. Therefore, Defendants Shepperd and County of Lincoln are entitled to summary judgment on Counts IV and V.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (*doc. 24*) is GRANTED.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**